SINCLAIR OIL & GAS CO. v. BRYAN et al.
(No. 8902.)*

(Court of Civil Appeals of Texas. Galveston.
Jan. 26, 1927. Rehearing Denied
Feb. 10, 1927.)

1. Mines and minerals ⬤⟶78(7)—Whether lessee used reasonable diligence in developing and preventing drainage of oil well held for jury.

Whether lessee had used reasonable diligence and care in developing property, leased under oil lease, and in protecting property from drainage through wells on adjoining land, held for jury.

2. Limitation of actions ⬤⟶180(2)—Averments that lessee had abandoned well did not allege that contract was repudiated so that statute of limitations would run against action for breach of lease.

Averments, in effect, that lessee had on certain date abandoned well, and had not since drilled another well on tract, though often requested by plaintiffs to do so, did not allege that lessee had completely and finally abandoned and repudiated lease contract on that date, so that statute of limitations would begin to run against action for failure to properly develop oil lease and to protect tract from drainage through adjoining wells.

3. Mines and minerals ⬤⟶77—Evidence held to show that oil lease contract was not abandoned, where well was abandoned.

In action for damages for failure to use reasonable diligence in developing oil wells under lease, evidence held to show that lease contract had not been abandoned, even though well on tract had been abandoned.

4. Mines and minerals ⬤⟶78(1), 79(1)—Oil lease contract, covering different tracts, separated in ownership, description, and location, held severable as regards development and payment of royalties.

Oil lease contract, covering four different tracts of land, separated from each other in ownership, description, and location, held to be severable, so that development of one tract was not dependent upon that of others, where royalties were to be paid to different owners as and when development of tracts should be accomplished by use of reasonable diligence.

5. Trial ⬤⟶352(1)—That special issues regarding diligence used in developing oil well did not limit inquiry to preceding four-year period held not error, in view of other issue.

Submitting special issues regarding reasonable diligence used by defendants in developing and protecting oil well, without limiting inquiry to 4-year period preceding suit, held not error, where special issue regarding quantity of oil that could have been produced by use of reasonable diligence and care limited inquiry to preceding 4-year period.

6. Mines and minerals ⬤⟶78(7)—Evidence held to support finding that lessee had not used reasonable diligence in developing leased tract for oil.

Evidence held to support finding that lessee, under oil lease, had not proceeded by and through use of reasonable diligence and care to develop leased tract for production of oil.

7. Mines and minerals ⬤⟶78(7)—Evidence held to support finding that lessee had not used reasonable diligence to protect leased tract from drainage through oil wells on adjoining property.

Evidence held to support finding that lessee, under oil lease, had not proceeded by and through use of reasonable diligence and care to protect leased tract from drainage through wells within 100 feet of any line of same on adjoining property.

8. Appeal and error ⬤⟶1070(2)—Appellate court could not set aside jury's findings, which imported same thing as finding which would have been justified from evidence.

Where there was evidence from which jury could have properly found that work-over job on oil well was not in due manner done, and did not constitute such reasonable diligence and care as would have been used by ordinary prudent person under like circumstances in development of oil lease, Court of Civil Appeals could not set aside findings importing same thing.

9. Mines and minerals ⬤⟶78(7)—Testimony that oil never goes from higher to lower levels did not foreclose question as fact issue for jury, in action for failure properly to develop oil lease.

In action for damages for failure properly to develop oil lease, testimony of certain witnesses that in oil-bearing strata adjacent to salt domes of Texas coastal plains, oil never goes from higher to lower levels because always driven upward by gas or salt water pressure, did not foreclose question as fact issue for jury of ordinary intelligence, where there was testimony that well on tract in question and deeper well on adjoining tract were producing from same oil sand strata.

10. Mines and minerals ⬤⟶78(7)—Production of oil from nearby wells might be considered by jury in estimating drainage from tract leased.

Comparisons of production of oil from nearby wells, extent of territory, and the like, were proper for jury to consider in estimating drainage of oil from tract, which had not been developed according to lease as agreed.

11. Witnesses ⬤⟶344(1) — Defendant's employees, testifying as to diligence used in developing property leased, could be cross-examined to show them lacking in capacity or credibility.

Where defendant sought by its employees to prove that it had used reasonable diligence and care and an honest judgment in protecting lessors' interests in developing property leased for oil, it was permissible on cross-examination to show that one of employees testifying, while

⬤⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused March 30, 1927.

not employed by defendant, had given another of defendant's employees bonus for contract to drill wells for defendant elsewhere than on tract in question, since it affected credibility of previous testimony and their capacity.

Appeal from District Court, Brazoria County; M. S. Munson, Judge.

Action by Jack Bryan and others against the Sinclair Oil & Gas Company. From a judgment for plaintiff, defendant appeals. Affirmed.

· Louis J. Wilson, of Angleton, and S. H. German, Jas. L. Shepherd. Jr., and Walter H. Walne, all of Houston, for appellant.

Allen Hannay, of Houston, S. E. Damon, of Austin, and Rucks & Enlow, of Angleton, for appellees.

GRAVES, J. This appeal is from a judgment in appellees' favor against appellant for $5,816 as damages for failure to use reasonable diligence and care from September 7, 1920, to August 29, 1925, in developing for oil and protecting from drainage by oil wells on adjoining property within 100 feet of it a half-acre tract of land at Damon Mound, Tex., owned by appellees and held by appellant under an oil lease. The lease was a joint one upon four small tracts of land belonging to the appellees, two of them, upon each of which there was a producing oil well throughout the period mentioned, being just across a 32-foot roadway from the half acre here involved, while the third one was some 1,500 feet from it; there was also during the same time a paying oil well on adjoining land less than 100 feet away, and a jury, in response to special issues, found that there had been remissness under the terms of the lease as to this half acre in both the respects referred to. The provision of the lease thus found not to have been lived up to was this:

"When oil in paying. quantities is developed and produced upon the land leased hereby by work on said land thereunder, or when the existence of oil thereunder in paying quantities is made apparent by the development and production of oil in paying quantities in well, or wells, on adjoining land and within 100 feet of any line of the land leased hereby, second party shall proceed, by and through the use of reasonable diligence and care, to develop the now leased property for oil as well as to protect it from drainage through wells within 100 feet of same on adjoining property."

Appellant assails the judgment on these grounds:

(1) The cause of action was barred by the four-year statute of limitation, in that the declaration upon it was not filed until September 7, 1924, whereas the breach by appellant of the obligation upon which it rested was alleged and shown to have occurred January 17, 1920.

(2) The court erred in submitting to the jury the issue as to whether or not appellant had used reasonable diligence and care in the matter of developing the property, without therein limiting the inquiry to a period within four years from the filing of the suit.

(3) There was no proof sufficient to go to the jury either that any drainage at all from the half acre had taken place, or, if so, as to the amount thereof.

(4) Reversible error was committed in permitting appellees to impeach and discredit certain ones of appellant's witnesses by proof of improper or discreditable conduct on their part with reference to matters wholly unrelated to the issues presented on this trial.

[1] Under the facts, none of these contentions, we think, may be sustained. The quoted stipulation of the lease plainly evidences an obligation to continuously, throughout the life of the contract, use reasonable diligence and care in developing and protecting from drainage all parts of the lease, there being no qualification restricting such development and protection to the drilling of wells at any specified time or upon any one of the tracts of land the joint lease embraced, and when the fulfillment of that undertaking as to the half acre was challenged, a fact issue as to it was raised. The trial court therefore properly submitted to a jury the inquiries as to whether or not there had been a breach of the agreement, as alleged. The lease as an entirety was in full force and effect, not only when this suit was both filed and tried, but had so been continuously since its inception in 1916, and, operating under it, appellant and its predecessors had brought in oil wells on the three tracts it covered other than the half acre here involved prior to the year 1920, which, after having each yielded thousands of barrels, were still producing at the time of this trial, and one on the half acre itself in May, 1917, which sanded up and ceased to produce about October 5, 1919, after yielding an aggregate of 302,679 barrels of oil. The well on adjoining land less than 100 feet from this half acre, previously referred to, belonged to appellant and had been producing oil in paying quantities continuously from February, 1918, until this trial below.

[2] The four-year limitation plea against this action, which was not filed till September 7, 1924, rests upon the assumption that the appellees pleaded, and that all the evidence showed, that appellant had completely and finally abandoned the lease contract—at all events as concerned the half-acre tract—on January 17, 1920, and had thereby then repudiated once for all any further obligation thereunder to ever thereafter either develop or protect from drainage any part of that tract; but we can neither so interpret the pleading nor read the proof. The evident purport of the averments was, merely, that appellant had on that date abandoned the above mentioned well on that tract, which was known as Bryan No. 3, and had ceased

to produce in the preceding October, and had not since its abandonment drilled another well or wells "on plaintiffs' said one-half acre tract of land aforesaid, though often requested by plaintiffs so to do." There is no charge or intimation that the lease, or contract, had been abandoned or repudiated on that date as to the half acre; on the contrary, the intendment is all the other way, because it was else where specifically alleged that the lease in its entirety had at all times remained in full force and effect, and that appellant had continuously up to the filing of the trial pleadings held and claimed the right to operate upon all four of the tracts under it.

[3] The evidence likewise fails to support the assumption; indeed, that from appellant's own successive field superintendents repels it, they each in effect testifying that the half acre was not abandoned in January, 1920, with the intention or purpose of not drilling another well thereon at some future time, should circumstances justify it, but that during their several terms of tenure subsequent to that date they in fact investigated conditions upon the ground from time to time, as they then found them, for the purpose of determining whether or not to at that time drill an additional well on the half-acre tract, and as a result of such investigations concluded each time not to do so.

There was no testimony to a different effect, so that, as against the suggestion of a final abandonment of the half acre on January 17, 1920, with contemporaneous repudiation of any further contractual obligation concerning it, the undisputed evidence may be said to show the contrary, thus disclosing a recognition thereafter by appellant of a continuing obligation upon its part to develop it, if and when changing conditions might require the drilling of an additional well thereon.

[4] That such obligation with respect to the half acre was divisible and severable, that is, susceptible of separation and apportionment apart from the remaining three individually integral parts of the lease, and that it was so mutually contemplated, seems equally plain; the contract, although wholly comprehended within one instrument, extended to four different tracts of land separated from each other in ownership, description, and location; its nature and terms, as well as the cited acts of the parties under it, not only rebut the idea that the development of any one of these tracts, with the consequent obligation to pay the royalty thereon, was to be in any way dependent upon that of the others, but affirmatively import the contrary, in that, both by necessary implication and by express provision, the royalties constituting the consideration were to be paid to different owners of the several tracts as and when the development thereof should be accomplished by the use of "such reasonable diligence and care

as an ordinary prudent person engaged in the same undertaking under like circumstances" would employ. See Corpus Juris, vol. 13, pp. 561 et seq.

Counsel for appellant in their brief concede the inapplicability of the limitation defense to the claim recovered for, if its obligation as to the half acre was thus a continuing and divisible one, attended by a breach thereof occurring less than four years before recovery was sought therefor; hence a discussion of the authorities so holding becomes unnecessary; as exemplifying the general principle applicable, however, these citations may be made: Jones & Co. v. Gammel-Statesman Pub. Co., 100 Tex. 331, 99 S. W. 701, 8 L. R. A. (N. S.) 1197; Davis v. Brown, 98 Ky. 475, 32 S. W. 614, 36 S. W. 540; Nelson v. San Antonio Traction Co. (Tex. Civ. App.) 142 S. W. 146, Id. 107 Tex. 180, 175 S. W. 434.

Since the damages awarded flowed only from the continuing failure to perform the contract during the period between September 7, 1920, and August 29, 1925, all of which was less than four years before the suit was filed, none of the claim was barred.

[5] Appellant's second objection is directly answered by the first three issues submitted to the jury and their verdict thereon, as follows:

"Special issue No. 1: Has the defendant, Sinclair Oil & Gas Company, proceeded by and through the use of reasonable diligence and care, as that term is hereinbefore defined, to develop the leased premises described in plaintiff's petition for the production of oil? You will answer this special issue 'yes' or 'no' as you find the facts to be. Answer: No.

"Special issue No. 2: Has the defendant, Sinclair Oil & Gas Company, proceeded by and through the use of reasonable diligence and care, as that term is hereinbefore defined, to protect said one-half acre of land from drainage through wells within 100 feet of any line of same on adjoining property? You will answer this issue 'yes' or 'no'. as you find the facts to be. Answer: No.

"Special issue No. 3: If you have answered special issues 1 and 2 'yes,' then you need not answer the following issues, but if you have answered either of said issues 'no,' then you will answer this special issue: What quantity of oil could have been produced by the defendant, Sinclair Oil & Gas Company, *by the use of reasonable diligence and care* from said one-half acre of land, if any, from the 7th day of September, 1920, to the 29th day of August, 1925? You will answer this issue by stating the quantity of oil in barrels. Answer: 38,-722." (The underscoring is our own.)

It thus appears that, while special issues 1 and 2 omitted limiting the inquiries to a period within four years from the filing of the suit, that was specifically added in No. 3, which was so correlated with them that it could not be answered one way or the other without supplying the deficiency; in other words, No. 3 restricted the jury to determin--

ing what oil, if any, could have been produced both within the particularized four-year period and by the use of reasonable diligence and care.

[6-9] The statement of facts discloses sufficient evidence to support all of these findings, although presenting some conflicts, especially that under issue No. 2 relating to drainage from wells on adjoining land; there was only one of such wells within the required 100 feet of this land. Woodward No. 3, hereinbefore referred to, which belonged to appellant was located only about 45 feet from the east line of this half-acre tract, and had been producing oil in paying quantities from February, 1918, which it was still doing when the jury answered these inquiries. The well on the half-acre tract itself, also previously mentioned, and known as Bryan No. 3, was located just about 50 feet from this adjoining Woodward No. 3, had continuously produced oil in paying quantities, except during short intervals when it would be sanded up, yielding a total of 302,679 barrels from May, 1917, till October 6, 1919, when it again sanded up and ceased to produce. For the last six days of its operation, that is, from October 1 to 6, it produced 528 barrels of oil, an average of 88 barrels per day. Appellant's predecessor in title under the lease then attempted to make it produce by side-tracking through the casing and drilling a new hole from there down to its original depth, but the efforts on this work-over job failed, and nothing else was ever done toward redeeming the obligations of the lease as affecting this tract.

There was evidence from which the jury could have properly found specifically, both that this work-over job on Bryan No. 3 was not in due manner done, and that, in the circumstances, it did not constitute "such reasonable diligence and care as would have been used by an ordinary prudent person engaged in the same undertaking under like circumstances," and therefore this court is without authority to set aside the findings they did so make, which import the same thing.

In view of this history and record of Bryan No. 3 itself, no explanation reasonably satisfactory to the jury was made as to why another well somewhere on the half acre could not have been profitably drilled and operated during the long period from September 7, 1920, to August 29, 1925, when, under the undisputed evidence, there were throughout that time producing wells on all its four sides only a short distance away.

The testimony of certain of appellant's witnesses to the general purport that, in the oil-bearing strata adjacent to the salt domes of the Texas coastal plains, the oil never goes from higher to lower levels because always driven upward by gas or salt-water pressure, does not necessarily foreclose this question as a fact issue for a jury of ordinary intelligence in the circumstance that here obtained, despite the fact that Woodward No. 3 was 108 feet deeper than Bryan No. 3, for the reason substantially thus stated in appellees' brief:

"Bryan No. 3 was drilled to an original depth of 1,449 feet, and blank casing set on a solid rock; several months later the well began to gas, still later on to produce oil, and it was the opinion of every witness who testified that the gas pressure cut its way through the rock into the casing; that the oil came from below and beneath the rock, and while Woodward No. 3 was drilled 109 feet deeper than Bryan No. 3, no rock was encountered in Woodward No. 3, but the screen was set at the bottom of it in oil sand that might well be presumed to have been the same oil sand strata as Bryan No. 3 was producing from, and it was the opinion of a number of the witnesses that the two wells were producing from the same oil sand strata."

[10] As concerns the amount of the drainage there were sufficient facts and circumstances before them, such as comparisons of production from nearby wells, extent of territory, and the like, to enable the jury to make a reasonable estimate, the matter not being susceptible of exact determination. Oil Co. v. Barker (Tex. Civ. App.) 252 S. W. 811; Blair v. Oil Co., 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430.

[11] The last presentment has raised a question not without its difficulties. Mandell and Dunlap were appellant's general superintendent and field manager, respectively, of extensive operations on its part for oil at Damon Mound from July, 1918, to April, 1922, when the former as superintendent was succeeded by Hooper, who continued as such to the time of this trial. Hooper had also previously been in the company's service in some capacity, leaving it in January, 1920, and not being with it from that date till his return as superintendent in April of 1922.

Throughout these successive terms the two superintendents had been in complete charge of the company's drilling activities in that field, and after officially considering the matter, each had in his turn concluded not to do any further drilling while he was so in charge on the half acre. After both had so testified as witnesses for appellant, over the general objection that it was irrelevant, the appellees were permitted to elicit from Hooper, on cross-examination, that between January, 1920, and April, 1922, at a time when he himself was not connected with the company, but during which the appellees were demanding that the half acre be further developed, he paid to Mandell and Dunlap, then appellant's general superintendent and field manager at Damon, respectively, a bonus of so much per well for a contract to drill wells for appellant elsewhere in that field than on appellee's half acre, which payment the two individuals divided between themselves.

Mandell, who had thus been the company's

plenary superintendent of operations in that territory from July, 1918, to April, 1922, during which period not only the doing of the Bryan No. 3 work-over job on the half acre, but also the appellant's failure to thereafter undertake any further development of that property had been the result of his immediate supervision, was also cross-questioned by appellees about this individual bonus to himself and Dunlap, but, on his making this response, "Your honor, if such was the case, which I am not admitting, I at the time was advised by an attorney that I might be liable for any profits which I received, and under those circumstances I might incriminate myself by replying to that question," the inquiry was dropped.

With much ability and force, counsel for appellant urge that the elicitation of these statements from its witnesses Hooper and Mandell amounted to their impeachment as such by the production against them on cross-examination of reprehensible acts upon their part in no way relating to the matters in controversy in the suit, thereby violating the well-settled rule in Texas against the impeachment of a witness in a civil cause in any other way than by proof of infirmity in his general reputation for truth and veracity, citing in support these authorities: Boom v. Weathered, 23 Tex. 675; Railway v. Johnson, 83 Tex. 628, 19 S. W. 151; Railway v. Creson, 101 Tex. 335, 107 S. W. 527; Johnson v. Brown, 51 Tex. 65; Tipton v. Thompson, 21 Tex. Civ. App. 143, 50 S. W. 641; Price v. Wakeham, 48 Tex. Civ. App. 339, 107 S. W. 132; Hazard v. Western Com. Travelers' Ass'n, 54 Tex. Civ. App. 110, 116 S. W. 625; Burchard v. Woodward (Tex. Civ. App.) 223 S. W. 707.

We are not prepared to hold this cause ruled by those decisions, under the conclusion that the equivalent of the facts here obtaining did not exist in any of them. In all those cases the matters objected to were wholly foreign to the issues on trial, while in this one they sustained intimate relation thereto; here the vital question was, under appellant's own pleading and the direct testimony of these two witnesses in well-nigh sole substantiation thereof, whether or not it could have produced more oil from this piece of land, either through further work upon Bryan No. 3, or by drilling another well thereon, during the very period of time over which these private bonus transactions with its individual employees were occurring, "through the use of reasonable diligence and care, and in the exercise of sound discretion and an honest judgment." It sought by these witnesses to prove that it had in fact throughout their entire period of service exercised such care, discretion, and judgment with reference to appellees' interest, thereby vouching for their capacity and credibility in what they did and said in

relation thereto. In such circumstances, we think it was permissible on cross-examination to show them lacking in either quality, and that the testimony complained of was receivable as affecting the credibility of their statements concerning their handling of the property here involved.

It is true the contention is made in argument that the evidence failed to show either when or in what oil field these bonus wells were located, but after careful examination of the record and statement of facts, our findings upon those features have been stated as reflecting what the proof shows.

This challenged testimony, then, not being collateral, but relevant to questions in issue, it becomes unnecessary in sustaining its admission to hold without qualification, as has our Court of Criminal Appeals in Carroll v. State, 32 Tex. Cr. R. 431, 24 S. W. 100, 40 Am. St. Rep. 786 (see, also, 28 Ruling Case Law, p. 611), that, for the purposes of testing his credibility, a witness may be specially interrogated on cross-examination in regard to specific acts generally, whether degrading or not, but the trial court's action may be upheld upon the conclusion that the matter here elicited did affect the competency of the witnesses as such, and therefore was receivable under well-settled authority. Burchard v. Woodward (Tex. Civ. App.) 223 S. W. 707; San Angelo Water, Light & Power Co. v. Baugh (Tex. Civ. App.) 270 S. W. 1104; Horton v. H. & T. C. Ry. Co., 46 Tex. Civ. App. 639, 103 S. W. 467; Sullivan v. Railway Co., 199 Mass. 73, 84 N. E. 844, 21 L. R. A. (N. S.) 36.

The judgment has been affirmed.

Affirmed.